UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

DONOVAN TERRELL PUGH,

                Petitioner,                  Case No. 1:15-cv-350

v.                                        Honorable Paul L. Maloney

KENNETH McKEE,

                Respondent.

_____/

## REPORT AND RECOMMENDATION

This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254.  Following a jury trial in the Berrien County Circuit Court, Petitioner was convicted of two counts of armed robbery, MICH. COMP. LAWS § 750.529, one count of receiving and concealing stolen property, MICH. COMP. LAWS § 750.535(4)(a), and one count of possessing a firearm during the commission of a felony (felony firearm), MICH. COMP. LAWS § 750.227b.  On December 26, 2012, the court sentenced Petitioner, as a third-offense felony offender, MICH. COMP. LAWS § 769.11, to two prison terms of fifteen years to 56 years and two months for the armed-robbery convictions, 242 days (time-served) on the receiving-and-concealing conviction, and two consecutive years on the felony-firearm conviction.  In his *pro se* petition, Petitioner raises two grounds for relief, as follows:

    I.    THE TRIAL COURT ABUSED ITS DISCRETION IN RULING
          THE PROSECUTION HAD SHOWN DUE DILIGENCE IN

ATTEMPTING TO PRODUCE EYEWITNESS DEONTRAY CALHOUN AND STEVE GREEN, AND DENYING HIM A MISSING WITNESS INSTRUCTION THUS DENYING [PETITIONER] HIS STATE AND FEDERAL CONSTITUTIONAL RIGHT TO CONFRONTATION.

II.    THE CASE SHOULD BE REMANDED TO THE TRIAL COURT FOR AN INDEPENDENT BASIS HEARING WHERE THE PROSECUTION PRESENTED EVIDENCE OF AN IMPERMISSIBLE AND SUGGESTIVE PRETRIAL, ONE-ON-ONE IDENTIFICATION PROCEDURE AND THEN USED THAT IDENTIFICATION EVIDENCE TO ALLEGE THAT [PETITIONER] WAS ONE OF THE ROBBERS, OR IN THE AL[]TERNATIVE, [PETITIONER] WAS DENIED HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL DUE TO HIS TRIAL ATTORNEY'S FAILURE TO OBJECT TO OR MOVE TO SUPPRESS THE IDENTIFICATION EVIDENCE.

(Pet., ECF No. 1, PageID.7, 11.) Respondent has filed an answer to the petition (ECF No. 5), stating that the grounds should be denied because they are noncognizable state law claims, procedurally defaulted, and lack merit. Upon review and applying the AEDPA standards, I find that Petitioner's grounds for relief are either noncognizable or without merit. Accordingly, I recommend that the petition be denied.

## **Procedural History**

### A.    **Trial Court Proceedings**

The state prosecution arose from the armed robbery of two persons, Deontray Calhoun and Robert Williams, while they were sitting in a vehicle on April 29, 2012. Petitioner was charged with two counts of armed robbery and one count of felony

firearm.  Following a preliminary examination on June 5 and June 7, 2012,[1] Petitioner was bound over on the armed-robbery counts, but the court required additional briefing on the application of a felony-firearm charge to aiding and abetting a felony.  (PE Tr. II, ECF No. 6-3, PageID.368.)  The district court subsequently agreed to bind over the felony-firearm charge.  (Cir. Ct. Docket Sheet, ECF No. 6-1, PageID.197.)  A supplemental information was filed charging petitioner as a habitual offender, third offense.  Petitioner also was later charged with receiving and concealing stolen property and assault with a dangerous weapon.  (*Id.*, PageID.198.)  Petitioner was tried before a jury beginning October 30, 2012, and concluding on November 1, 2012.[2]

Robert Shontae Williams testified that, on April 28, 2012, he and his half-brother, Deontray Calhoun, attended a concert at Lake Michigan College, which let out in the early morning hours of April 29.  (T. Tr. I, ECF No. 6-7, PageID.597.)  After the concert, they stopped at Calhoun's house on Clay Street for a short time, and then drove to the gas station around the corner.  They returned to Calhoun's house at about 2:40 a.m., and they parked in the driveway for about five minutes.  (*Id.*, PageID.598-99.)  Calhoun was driving Williams' white Crown Victoria, an old police car, and

---

[1]The transcripts of the preliminary examination will be referenced as follows:
Preliminary Examination Transcript of June 5, 2012:        PE Tr. I, ECF No. 6-2, PageID___.
Preliminary Examination Transcript of June 7, 2012        PE Tr. II, ECF No. 6-3, PageID___.

[2]The trial transcripts will be referenced as follows:
Trial Transcript of October 30, 2012        T Tr. I, ECF No. 6-7, PageID.___.
Trial Transcript of October 31, 2012        T Tr. II, ECF No. 6-8, PageID.___.
Trial Transcript of November 1, 2012        T Tr. III, ECF No. 6-9, PageID.___.

Williams sat in the front passenger side.  (*Id.*, PageID.599-600.)   A porch light illuminated the area.

Suddenly, Calhoun and Williams heard someone run past the car and smack the window, which sounded like a gun had been fired into the driver's window.  They looked up and saw a gun.  (*Id.*, PageID.601.)  Someone threw the driver's door open. (*Id.*, PageID.602.)  Williams could see two persons, whom he identified as men by their voices.  (*Id.*, PageID.603.)  He could not see their faces, because they wore black masks with eye holes cut in them.  (*Id.*, PageID.604-605.)  The man who had the gun was wearing dark clothing.  The man kept saying, "Give us everything."  (*Id.*, PageID.606.) The other man was telling the man with the gun, "Shoot 'em."  (*Id.*)  Williams pulled everything he had from his pockets, which consisted of two phones and some money. One was a black Boost phone with a touch screen and a dot in the middle of the screen caused by it having been dropped.  The other was a white iPhone.  Williams also handed over the his car keys for a different vehicle, a Chevy Caprice, which was parked in front of the house.  (*Id.*, PageID.607-608.)

After that, Steve Green (Calhoun's uncle) opened the door of the house.  The man with the gun pointed the weapon at Green, causing Green to go back inside the house.  The two robbers took off, running toward Monroe Street.  As they ran away, Petitioner saw a third person, who was standing nearby, take off after them.  The third person was not wearing a mask, and Williams recognized him.  (*Id.*, PageID.610.) Williams went inside the house and called his girlfriend, Alecia Johnson, and instructed her to track his iPhone, through the "Find my iPhone" application, which

tracks the location of the phone on a satellite map.  (*Id.*, PageID.611-614.)  After he called Johnson, Williams hung up and called 911.  (*Id.*, PageID.615.)  He then called Johnson back, so she could relay to him information about the location of the phone. (*Id.*, PageID.617-618.)  When the officer arrived, Williams explained what had happened and told the officer that he was tracking the thieves.  Alicia Johnson arrived at the home about five minutes after the police.  (*Id.*, PageID.618.)  Johnson gave Williams her phone to continue tracking.  When the phone stopped moving, Williams sent an alert to the phone, so the police could hear it.  (*Id.*, PageID.619.)

Sometime later, the police brought one suspect to the house, for Williams to identify.  Williams recognized him as the third man, who had not been wearing a mask. (*Id.*, PageID.620.)  Williams learned that the police had a second suspect.  Williams went to the police station to identify the second suspect, and Williams recognized that man's clothing.  (*Id.*, PageID.621.)  He identified the man, based on the clothing, as the robber who did not have the gun, and he identified Petitioner in court as the man he had previously identified.   Williams testified that he knew Petitioner, because Petitioner had a baby with Williams' cousin.  (*Id.*, PageID.622-623, 645; T. Tr. II, PageID.963-964.)  Williams also identified the picture of the Chevy Caprice parked in front of the house.  He believed that a picture was taken of the vehicle because the key taken by the robbers was for that vehicle.  (*Id.*, PageID.631, 669.)  Williams also identified his iPhone, which had been cracked in multiple places after it was taken from him, and he identified a second phone as his Boost phone.  (*Id.*, PageID.637-639.) In addition, he identified a black mask that looked like the mask the robber wore.  (*Id.*,

PageID.640.)  Williams acknowledged that neither he nor Calhoun told the police that Calhoun was also in the vehicle, because Calhoun had a warrant out for his arrest, and he did not want to go to jail.  (*Id.*, PageID.641.)

Defense counsel cross-examined Williams at length.    Counsel elicited information that Williams had told the police that he was driving the car; suggested that Williams had lied about which car, the Chevy Caprice or the Crown Victoria, was involved; questioned the timing of the phone tracking; verified that Petitioner had not been able to describe the clothing to police or at trial; and verified that Williams could not remember or describe the gun.  (*Id.*, PageID.650-51, 656-657,660-661.)

Alecia Johnson testified that Williams had called her at about 2:30 a.m., and told her that he was heading home soon.  (T. Tr. II, ECF No. 6-8, PageID.725.)  Half an hour later, he called her again, saying that he and his brother had been robbed. Williams sounded angry, and he asked Johnson to track his phone.  (*Id.*, PageID.726-727.) She used the app on her phone and put in Williams' email address and password. She started tracking the phone, and kept hitting "refresh" to get the new location.  (*Id.*, PageID.728-731.) After she started to track the phone, she and Williams hung up their call, so that Williams could call the police.  Johnson called her mother to come over so that she could join Williams.  (*Id.*, PageID.733.)   Her mother arrived within five minutes.  (*Id.*, PageID.736.)  Johnson called Williams back, put the phone on speaker, and continued to refresh the location as she talked to Williams and drove to Calhoun's house to join Williams.  (*Id.*, PageID.732, 735.)  The location first showed the phone to be in the area of Broadway and May, and then it moved across town toward a street

- 6 -

by the MLK school.  (*Id.*, PageID.734-735.)  When  she arrived at Calhoun's house, the officer was there.  She kept tracking the phone for about ten minutes or more, as the officer radioed another officer.  (*Id.*, PageID.737.)  Williams' uncle, Steve Green,  was outside of the house.  (*Id.*, PageID.739-740.)  At some point, the tracking dot stopped, and Johnson let the officer know.  She told the officer that she could make the phone make a sound by pressing a button on the app, which she then did.  (*Id.*, PageID.741-742.)  After pressing the button, the phone would continue to ring until it is answered. She later learned that the phone was found.  (*Id.*, PageID.742.)

The police took her contact information, and, shortly thereafter, called Williams and her to come down to the station, and they were placed in a room with a view into another room.  She was with Williams when the police brought a person into the other room.  (*Id.*, PageID.742-743.)  She saw the person, and Williams was able to identify the person from his clothes.  She identified Petitioner as the man she saw at the police station.  (*Id.*, PageID.743-745.)

Benton Harbor Public Safety Officer Michael Clark testified that, on April 29, 2012, he was dispatched at 3:44 a.m. to the Clay Street address, but he had not been informed that it was an armed-robbery call.  (*Id.*, PageID.763-766.)  He arrived at 3:52 a.m. When he arrived, Williams approached him, seeming rather excited, and told Clark that he had just been robbed.  (*Id.*, PageID.766.)  Clark testified that Williams told him that the crime had occurred on the street, in front of the address, and involved that Chevy Caprice, in which Williams had been sitting.  (*Id.*, PageID.767.)  Once Clark

discovered that it was an armed robbery and that Williams was tracking the phone, Clark put the information out to all units.

Williams told Clark that he had been sitting in the car, two men approached him, they showed a handgun, and they took an iPhone 4S, some money, his wallet, and the keys to the Chevy Caprice. (*Id.*, PageID.768.) Clark testified that there was some conversation about the car in the driveway, but that car was locked and he was not told that it was involved in the crime. (*Id.*, PageID. 770-771.) Williams did not tell him that Deontay Calhoun was involved. Clark testified that he tried to contact and interview Calhoun on numerous occasions, and he tracked him down at a gas station. Calhoun told Clark that he did not want to testify in the case. Clark later attempted multiple times to serve a subpoena on Calhoun, but he was unable. Clark knew that Calhoun lived at the Clay Street address and usually drove a white Ford Crown Victoria, but Clark had not been able to reach him. Clark testified that Johnson arrived once he was at the scene, and he described the route the tracking app showed. Clark testified that he relayed the travel of the phone to the other officers in the area, who proceeded to the broadcast locations. (*Id.*, PageID.777.) The radio traffic was played for the jury. (*Id.*, PageID.779, 781-786.) After the phone was located in a vehicle, the driver of the vehicle was brought back to the scene, and Williams identified him as the third man at the robbery. (*Id.*, PageID.792-793.) The iPhone was brought to Clark at that time. (*Id.*, PageID.801.) The screen still showed the tracking app, and the phone had been damaged when someone tried to take it apart. (*Id.*, PageID.801-802.)

- 8 -

Clark left the Clay Street house and went to the location where the phone was found.  When he arrived, he collected a black knit stocking cap with eyeholes cut into it, which had been picked up from the street by Officer Plane.  (*Id.*, PageID.794-795.) The hat was quite dry, despite the heavy dew that made the roads wet.  (*Id.*, PageID.797-798.)  He also collected the other items, including another cell phone, some cash, and a baseball bat.  (*Id.*, PageID.801, 804.)  Clark also took a buccal swab from Petitioner.  (*Id.*, PageID.804.)  Clark sealed the items, tagged them, logged them, and stuck them in the evidence locker.  (*Id.*, PageID.808.)  Clark also took pictures of the clothing worn by the two individuals who were arrested.  (*Id.*, PageID.809-810.) Petitioner's clothing consisted of a hooded sweatshirt and a shirt underneath that had a logo.  (*Id.*, PageID.811.)

On cross-examination, Clark testified that Williams initially told him that the incident happened while Williams was in the driver's seat of the Chevy Caprice and that Mr. Green was in the passenger seat.  (*Id.*, PageID.817-818.)  Clark also talked to Green that night, and Williams was present in the yard, but not right next to them. (*Id.*, PageID.820-821.)  He later learned that Green was not the other person in the vehicle.  (*Id.*, PageID.823.)  Clark interviewed Williams in June, and Williams revealed that the person in the vehicle with him was Calhoun, and he revealed that he had been in the passenger seat and that Calhoun was driving.  (*Id.*, PageID.824-825.)  The keys to the Chevy were never recovered, nor were a wallet or any property of Green.  (*Id.*, PageID.828.)

- 9 -

Michigan State Police Trooper Garry Guild testified that, in the early morning hours of April 29, 2012, he and his partner Jim Janes overheard radio traffic from Benton Harbor Police Department about an iPhone that was stolen at gunpoint.  (*Id.*, PageID.836.)  He heard that the vehicle was traveling northbound on Pipestone Road approaching Heck Court and Britain Street.  He was in the area, so he responded to the area and paid attention to the dispatch updates.  (*Id.*, PageID.836-837.)  Traffic was light, and at some point he saw an SUV that appeared to be following the track of the iPhone.  The troopers did a U-turn and followed the vehicle.  (*Id.*, PageID.838.)  The SUV took off quickly and made a left turn.  When the officers activated their overhead lights, the vehicle stopped, but two occupants left the vehicle and ran on foot into a vacant lot.  (*Id.*, PageID.839.)  The driver of the vehicle stayed in the SUV.  (*Id.*, PageID.840.)  Guild took the driver's identification and then secured him in handcuffs while they spoke to him.  (*Id.*, PageID.841.)  He and his partner transported the driver back to the Clay Street address.  When they were there, they learned that the iPhone was still pinging near where they had stopped the SUV.  He notified the other units that the iPhone was between McGuigan and Mineral Streets.  (*Id.*, PageID.842-843.)  The other units searched and found a man hiding in that area, under the deck of a residence.  (*Id.*, PageID.843-844.)

Trooper Jim Janes substantially supported Trooper Guild's testimony.  He indicated that they lost sight of the SUV briefly when it turned the corner, but when they turned the corner, they saw the passenger door open on the SUV.  The driver remained in the SUV.  (*Id.*, PageID.858.)

Robert Plane testified that he was a Benton Harbor Patrolman at the time of the incident. (*Id.*, PageID.862.) When the state troopers stopped the SUV, he was two blocks north of their location, on Thresher Street. He sat in his vehicle to make sure that no one ran to the north, as the troopers had radioed that one person ran south and one ran north. (*Id.*, PageID.864, 869.) In the middle of the street, he saw a stocking cap with eyeholes cut in it. (*Id.*, PageID.864.) Half an hour later, he turned the hat over to Officer Clark. (*Id.*, PageID.865.)

Aaron Devonte Allen testified the he was arrested and charged with armed robbery for the incident in question. He had never known Petitioner prior to the incident. (*Id.*, PageID.898.) Allen pleaded guilty to being an accessory after the fact. (*Id.*, PageID.898-899.) Allen testified that he came into contact with Petitioner when his car was stopped at the light at the corner of Britain and Pipestone. Petitioner got into Allen's car, a silver Ford Escape, as did one other person. (*Id.*, PageID.900-901.) When the state police pulled the vehicle over, the two men ran. (*Id.*, PageID.901-902.) The police took Allen back to the Clay Street house, where a number of people looked at him, and then took him to the station. Allen testified that he was not aware that anyone tried to sell Petitioner anything while he was in Allen's SUV, though he claimed that he went into the gas station and that such a sale could have been made without him being aware. (*Id.*, PageID.902-903.)

Forensic Scientist Lisa Champion testified as an expert in serology and DNA analysis. (*Id.*, PageID.923.) Champion stated that she swabbed the stocking hat to collect DNA, focusing on the area around the mouth and nose. (*Id.*, PageID.924, 926.)

She placed the swab in a plastic extraction tube, put it in an envelope and placed it in the freezer. (*Id.*, PageID.924.)  The swab from the hat revealed that there were at least four donors in the mixture.  (*Id.*, PageID.934-935.)  She compared the mask DNA to that of Petitioner and concluded that Petitioner was not the major donor, but Petitioner could not be excluded as a minor donor to the mixture.  (*Id.*, PageID.936.)

On recall, Officer Clark testified that he had made multiple attempts to serve Deontray Calhoun and Steven Green with subpoenas, to no avail.  (T. Tr. II, ECF No. 6-8, PageID.972-976.)  Defense counsel moved for a missing-witness instruction, given that Mr. Williams was family to the two men and given that Calhoun was driving a vehicle titled to Williams' girlfriend.  (*Id.*, PageID.979.)  The court declined to give the instruction, concluding that the prosecution had made sufficient attempts to produce the witnesses.  The parties stipulated that fingerprints were found on the driver side rear door and on the passenger side rear door.  The prints did not match those of Petitioner.  (T. Tr. III, ECF No. 6-9, PageID.986-987.)

Benton Harbor Public Safety Officer William Althouse testified that he had been working road patrol on the midnight shift on April 29, 2012.  When Officer Clark relayed the position of the cell phone, Althouse participated in the tracking of the phone.  (*Id.*, PageID.988-989.)  As Althouse drove down McCord, he saw the vehicle turn onto McCord, followed by the state police.  Althouse then tried to initiate a stop.  (*Id.*, PageID.990.)  He then followed the phone signal on foot.  He and Officer Luke Laten determined that the phone was underneath a low porch on a house in the 800 block of McGuigan and Vineyard.  They found Petitioner.  (*Id.*, PageID.990-992, 997.)

Althouse and Laten induced Petitioner to come out and then handcuffed him.  (*Id.*, PageID.993.)  As Petitioner moved, the officers saw something underneath him. Officer Laten crawled back under the porch and retrieved a hat, under which they found the iPhone.  (*Id.*, PageID.994-995.)  Petitioner told the officers that he had bought the iPhone from someone on the street.  (*Id.*, PageID.998.)

Benton Harbor Police Detective Wes Smigielski testified that he was in charge of the detective bureau.  (*Id.*, PageID.1012.)  He was called at 4:20 a.m. on April 29, 2012. (*Id.*, PageID. 1013.)  Smigielski went to Seeley and Vineyard, where the traffic stop was made.  He brought both suspects, one of whom was Petitioner, back to the station for interviews.  (*Id.*, PageID.1014-1015.)  Smigielski read Petitioner his *Miranda* rights and then confirmed that he was not under the influence of drugs or alcohol.  (*Id.*, PageID.1015.)  Before he began interviewing Petitioner, he had Mr. Williams in his office to view Petitioner through the two-way mirror.  Williams identified Petitioner by his clothing.  (*Id.*, PageID. 1016.)

Petitioner acknowledged that he had been in the Ford Escape that had been stopped by police, and he admitted that he had run from the vehicle.  (*Id.*, PageID.1017.)  Petitioner told Smigielski that he had damaged the phone trying to shut it off and that he had purchased it and a Wal-Mart gift card at a gas station for $60.  Petitioner originally identified the Sunny Spot gas station and then said it was the Sunoco on Pipestone.  (*Id.*, PageID.1018-1019, 1024.)  Petitioner said that he had been picked up by someone at Sunny Spot.  (*Id.*, PageID.1019-1020.)

- 13 -

After interviewing Petitioner, Smigielski interviewed Aaron Allen.  He participated in a search of the car later that morning, during which he found two more cell phones, including the Boost phone that had been taken from Williams and a T-Mobile phone.  (*Id.*, PageID.1025-1026.)

Smigielski transported to the state police crime lab the evidence he collected, together with the latent fingerprints, a mask, and some DNA.  (*Id.*, PageID.1027.)

At the conclusion of the trial, on November 1, 2012, the jury found Petitioner guilty on both counts of armed robbery, felony firearm, and receiving and concealing stolen property.  The jury found Petitioner not guilty of assault with a dangerous weapon against Steven Green.  (*Id.*, PageID.1117-1123.)  On December 28, 2012, the court sentenced Petitioner as a third-offense habitual offender to serve two prison terms of fifteen years to 56 years and two months on the armed-robbery convictions, a consecutive term of two years on the felony-firearm conviction, and time served on the receiving and concealing conviction.  (Sentencing Tr. (S. Tr.), ECF No. 6-10, PageID.1136.)

B.    **Direct Appeal**

Petitioner appealed as of right to the Michigan Court of Appeals.  His brief, which was filed by counsel on August 7, 2013, raised the same two issues presented in this application for habeas corpus relief.  (*See* Def.-Appellant's Br. on Appeal, ECF No. 6-11, PageID.1147.)  By unpublished opinion issued on April 10, 2014, the Michigan Court of Appeals rejected all appellate arguments and affirmed Petitioner's convictions

- 14 -

and sentences.  (*See* 4/10/14 Mich. Ct. App. Opinion (MCOA Op.), ECF No. 6-11, PageID.1139-1143.)

Petitioner, through counsel, filed an application for leave to appeal to the Michigan Supreme Court, raising the same two claims presented to and rejected by the Michigan Court of Appeals.  (Def-Appellant's Appl. for Leave to Appeal, ECF No. 6-12, PageID.1226-1256.)  Petitioner was granted leave to amend his application, in which he further developed his first issue.  By order entered September 29, 2014, the Michigan Supreme Court denied his application for leave to appeal because it was not persuaded that the questions presented should be reviewed.  (See Mich. Ord., ECF No. 6-12, PageID.1215.)

### Standard of Review

This action is governed by the Antiterrorism and Effective Death Penalty Act of 1996, PUB. L. 104-132, 110 STAT. 1214 (AEDPA).  *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  The AEDPA has "drastically changed" the nature of habeas review. *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision

that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."   28 U.S.C. § 2254(d).  This standard is "intentionally difficult to meet."  *Woods v. Donald*, 575 U.S. __, 135 S. Ct. 1372, 1376 (2015) (internal quotation marks omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court.  *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655.  In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Lopez v. Smith*, 135 S. Ct. 1, 3 (2014); *Bailey*, 271 F.3d at 655.  Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court.  *Greene v. Fisher*, 132 S. Ct. 38 (2011).  Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits.  *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 132 S. Ct. at 44).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts.  *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405-06).  "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in

justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 2015 WL 1400852, at *3 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).  In other words, "[w]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims."  *White v. Woodall*, 572 U.S. ___, 134 S. Ct. 1697, 1705 (2014) (quotations marks omitted).

Where the state appellate court has issued a summary affirmance, it is strongly presumed to have been made on the merits, and a federal court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA.  *See Harrington*, 562 U.S. at 99; *see also Johnson v. Williams*, 133 S. Ct. 1088, 1094 (2013); *Werth v. Bell*, 692 F.3d 486, 494 (6th Cir. 2012) (applying *Harrington* and holding that a summary denial of leave to appeal by a Michigan appellate court is considered a decision on the merits entitled to AEDPA deference).  The presumption, however, is not irrebuttable.  *Johnson*, 133 S. Ct. at 1096.  Where other circumstances indicate that the state court has not addressed the merits of a claim, the court conducts *de novo* review.  *See id.* (recognizing that, among other things, if the state court only decided the issue based on a state standard different from the federal standard, the presumption arguably might be overcome); *see also Harrington*, 562 U.S. at 99-100 (noting that the presumption that the state-court's decision was on the merits "may be overcome when there is reason to think some other explanation for the state court's decision is more likely"); *Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989). Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

## Discussion

### I.    Missing Witnesses & Confrontation Clause

In his first ground for habeas relief, Petitioner argues that the trial court abused its discretion in determining that the prosecution had shown due diligence in attempting to locate Deontray Calhoun and Steven Green, and that it had improperly denied Petitioner's request for a missing witness instruction. Petitioner also argues that the failure to produce these witnesses denied his constitutional right to confrontation.

The Michigan Court of Appeals addressed Petitioner's claim as follows:

> We review a trial court's decision regarding due diligence and the appropriateness of a missing witness instruction for an abuse of discretion. *People v Eccles*, 260 Mich App 379, 389; 677 NW2d 76 (2004).

A prosecutor who endorses a witness must use due diligence to produce that witness at trial. *Id.* at 388. If the prosecution fails to show due diligence in locating and serving a witness, the defendant may be entitled to a missing witness instruction, which allows a fact-finder to infer that the missing witness' testimony would have been unfavorable to the prosecution's case. *Id.*

The record demonstrates that Michael Clark, an officer with the Benton Harbor Department of Public Safety, made numerous efforts in the weeks leading up trial to locate both Calhoun and Green, to no avail. As to Calhoun, Clark testified that he was previously able to locate and serve Calhoun for a related case. At that time, Calhoun told Clark he had no interest in being involved. However, no subpoenas had been issued in relation to the instant case, and ultimately, the related case never went to trial. Thus, it was unclear whether Calhoun would in fact fail to appear. In any event, Clark testified that he made at least four attempts to locate Calhoun at his residence and at another address Calhoun was known to frequent, spoke with Calhoun's family members, kept a lookout for Calhoun's vehicle, and asked other officers to do so as well. Additionally, Clark checked the Law Enforcement Information Network (LEIN), as well as various county websites, to verify whether Calhoun was incarcerated.

Regarding Green, Clark testified that he spoke with Green on the night of the robbery, and Green provided a Michigan ID containing an address in Benton Township. Green also gave Clark the address of a residence in South Bend, Indiana, and a cellular telephone number. Upon checking the Benton Township address, Clark discovered Green had not lived there in at least one year. Moreover, Green stopped answering his cellular telephone, and eventually the service to that telephone was shut off. Clark enlisted the help of the South Bend police department to check the address Green had given him and was informed that address did not exist in South Bend. Clark expanded the search to all of Saint Joseph County, Indiana, but again found no residence matching the address given. Clark checked another address Green was known to frequent and spoke with family members, all to no avail.

We conclude that the record supports that there were diligent attempts to produce both Calhoun and Green for trial, and therefore the trial court did not abuse its discretion when it refused to issue the missing witness instruction.

Defendant's other argument, that he was denied his constitutional right of confrontation, also lacks merit.  "[T]he right of confrontation is concerned with a specific out-of-court statement, i.e., the statements of 'witnesses,' those people who bear testimony against a defendant." *People v Fackelman*, 489 Mich 515, 528; 802 NW2d 552 (2011), quoting *Crawford v Washington*, 541 US 36, 51; 124 S Ct 1354; 158 L Ed 2d 177 (2004). There is no indication in this case that the prosecution introduced into evidence any prior testimonial statements from Calhoun or Green.  Thus, because neither Calhoun nor Green "b[ore] testimony" against defendant, *Fackelman*, 489 Mich at 528, they were not witnesses for purposes of the Confrontation Clause, and that constitutional right was not implicated by the prosecution's failure to produce them at trial.

(MCOA Op., ECF No. 6-11, PageID.1140-1141.)

To the extent that Petitioner claims that the trial court erred in applying state law concerning missing witnesses, his claim is not cognizable on habeas review.  "[A] federal court may issue the writ to a state prisoner 'only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.'" *Wilson v. Corcoran*, 562 U.S. 1, 5 (2010) (quoting 28 U.S.C. § 2254(a)).  It is not the province of a federal habeas court to re-examine state-law determinations on state-law questions.  *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *Estelle v. McGuire*, 502 U.S. 62, 68 (1991).  The decision of the state courts on a state-law issue is binding on a federal court.  *See Wainwright v. Goode*, 464 U.S. 78, 84 (1983).  The Sixth Circuit repeatedly has recognized "'that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.'"  *Stumpf v. Robinson*, 722 F.3d 739, 746 n.6 (6th Cir. 2013) (quoting *Bradshaw*, 546 U.S. at 76).  As a consequence, the court of appeals' determinations

- 20 -

that the prosecution had demonstrated due diligence in locating the witnesses and that Petitioner was not entitled to a missing witness instruction are binding on this Court.

Petitioner also is not entitled to relief on his claim that the Confrontation Clause required the prosecution to produce Calhoun and Green as witnesses in the case. The Confrontation Clause of the Sixth Amendment gives the accused the right "to be confronted with the witnesses against him." U.S. CONST., Am. VI; *Pointer v. Texas*, 380 U.S. 400, 403-05 (1965) (applying the guarantee to the states through the Fourteenth Amendment). "The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *Maryland v. Craig*, 497 U.S. 836, 845 (1990). The Confrontation Clause therefore prohibits the admission of an out-of-court testimonial statement at a criminal trial unless the witness is unavailable to testify and the defendant had a prior opportunity for cross examination. *Crawford v. Washington*, 541 U.S. 36, 59 (2004).

The Supreme Court has summarily rejected the notion that the Confrontation Clause requires the government to produce all witnesses it may have, even if those witnesses have not provided evidence used at trial:

> Petitioner also presents the contention here that he was unconstitutionally deprived of the right to confront a witness against him, because the State did not produce the informant to testify against him. This contention we consider absolutely devoid of merit.

*Cooper v. California*, 386 U.S. 58, 62 n.2 (1967). *See also United States v. Avila-Gonzalez*, 611 F. App'x 801, 804 (5th Cir. 2015) (citing *Cooper* and holding that the

government need not produce a witness if no statement of the witness was introduced); *United States v. Moore*, 954 F.2d 379, 381 (6th Cir. 1992) ("The Sixth Amendment does not, however, require the government to call every witness competent to testify . . . ."); *United States v. Porter*, 764 F.2d 1, 9-10 (1st Cir. 1985); *United States v. Morgan*, 757 F.2d 1074, 1076 (10th Cir. 1985) (holding that the "Confrontation Clause is not a guarantee that the prosecution will call all the witnesses it has against the defendant").

In the instant case, the prosecution did not introduce any statement by Calhoun or Green. Indeed, Calhoun never made a statement to any official. In addition, when defense counsel sought to inquire about a statement made by Green, the prosecutor objected on the ground that the question called for hearsay. (T. Tr. II, ECF No. 6-8, PageID.821-822.) Because no statement of these witnesses was put into evidence, they were not required to testify at trial.

Accordingly, Petitioner's first ground for relief is either noncognizable or without merit.

## II.    <u>Suggestive Identification & Ineffective Assistance of Counsel</u>

In his second ground for habeas relief, Petitioner contends that the prosecutor presented evidence of an impermissibly suggestive pretrial identification to identify Petitioner as one of the robbers. He also contends that defense counsel rendered ineffective assistance when he failed to object to or move to suppress the identification evidence.

Due process provides a "check on the admission of eyewitness identification, applicable when the police have arranged suggestive circumstances leading the witness to identify a particular person as the perpetrator of a crime." *Perry v. New Hampshire*, 565 U.S. 228, 232 (2012).   The principle of due process "prohibits the use of identifications which under the totality of the circumstances are impermissibly suggestive and present an unacceptable risk of irreparable misidentification." *United States v. Peterson*, 411 F. App'x 857, 864 (6th Cir. 2011) (citing *Carter v. Bell*, 218 F.3d 581 (6th Cir. 2000)).  In determining whether an unacceptable risk of misidentification exists, courts employ a two-step analysis.  *Haliym v. Mitchell*, 492 F.3d 680, 704 (6th Cir. 2007) (quoting *Stovall v. Denno*, 388 U.S. 293, 301-02 (1967), and citing *Neil v. Biggers*, 409 U.S. 188, 197 (1972)).  The first step requires a determination as to whether the identification was "unnecessarily suggestive." *Id.*  The second step of the inquiry requires consideration of a number of factors, including "1) the witness's opportunity to view the criminal at the time of the crime; 2) the witness's degree of attention; 3) the accuracy of the witness's prior description of the criminal; 4) the level of certainty demonstrated at the confrontation; and 5) the time between the crime and the confrontation." *McComb*, 249 F. App'x at 437 (citing *United States v. Beverly*, 369 F.3d 516 (6th Cir. 2004)); *see also Haliym*, 492 F.3d at 704 (citing *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977), and *Biggers*, 409 U.S. at 199-200.  If "the first step of the requisite analysis ends in the government's favor, [the court] need not address" the second step of the inquiry. *United States v. Stamper*, 91 F. App'x 445, 462 (6th Cir. 2004).

The Michigan Court of Appeals addressed the issue at length:

Defendant next argues that the trial court erred in allowing testimony from Williams regarding an out-of-court identification of defendant. Defendant maintains that the out-of-court identification procedure was impermissibly suggestive. He also argues that the case should be remanded to allow the trial court to determine whether there was an independent basis for Williams' in-court identification of defendant. In addition, he argues that his trial counsel was ineffective for failing to object to this testimony at trial. Because the evidentiary issue was not preserved at trial, we review the issue for plain error affecting substantial rights. *People v McCray*, 245 Mich App 631, 638; 630 NW2d 633 (2001), citing *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999). Additionally, because defendant failed to move for a new trial or, in the alternative, a Ginther[1] evidentiary hearing regarding his claim of ineffective assistance of counsel, our review of this issue is limited to mistakes apparent in the record. *People v Sabin (On Second Remand)*, 242 Mich App 656, 658-659; 620 NW2d 19 (2000).

A pretrial identification procedure violates a defendant's right to due process of law when, under the totality of the circumstances, it is "so impermissibly suggestive that it gives rise to a substantial likelihood of misidentification." *People v Gray*, 457 Mich 107, 111; 577 NW2d 92 (1998). "[A]n improper suggestion often arises when the witness[,] when called by the police or prosecution[,] either is told or believes that the police have apprehended the right person" or "when the witness is shown only one person[,] or a group in which one person is singled out in some way," such that the witness "is tempted to presume that he is the person." *Gray*, 457 Mich at 111 (internal quotations and citation omitted).

We conclude that the admission at trial of Williams' testimony regarding the out-of-court identification was error. The record indicates that following the armed robbery Williams could not give any type of description of the assailants to the 911 operator. Further, Williams could only tell the responding police officer that the assailants were wearing dark clothing. After the police apprehended defendant, they took him to the Benton Harbor police station for questioning. Williams then went to the station and was asked to identify defendant as a possible suspect. Williams was told by police that they had someone in custody and that the person in custody had been found in possession of Williams' iPhone. Williams thereafter viewed defendant, who was sitting in an interview room, and identified him as the individual who did not have a gun during the robbery. Given the totality of the unique circumstances of this case,

- 24 -

especially Williams' inability to give any meaningful description of his assailants immediately following the robbery, the display of defendant in an interview room, the statement by police that defendant was the man found in possession of Williams' iPhone, and the lack of an independent basis for Williams' in-court identification of defendant, we are compelled to deem the identification procedure in this case improper. *See Gray*, 457 Mich at 111.

[1]*People v. Ginther*, 212 N.W.2d 922 (Mich. 1973).

(MCOA Op., ECF No. 6-11, PageID.1141-1142.)

The state court relied upon clearly established Supreme Court precedent for determining whether the identification procedure was impermissibly suggestive, despite the fact that the court cited only state law.[3]  Upon review, I conclude that the Michigan Court of Appeals reasonably applied that standard to conclude that Williams' identification of Petitioner at the police station was unduly suggestive and should not have been admitted.

Nevertheless, a habeas petitioner is not entitled to relief based on state trial-court error unless he demonstrates that the error "had a substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 622 (1993).  In determining whether the restriction was harmless, a court must consider a number of factors, " 'includ[ing] the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall

---

[3]The court of appeals relied upon *People v Gray*, 577 NW2d 92,94 (1998), which, in turn, cites *United States v. Simmons*, 390 U.S. 377, 384 (1968), one of the *Stovall v. Denno*, 388 U.S. 293, 301-02 (1967), line of cases reciting the constitutional standard.

strength of the prosecution's case.' " *Hargrave*, 248 F. App'x at 728 (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986)).

The court of appeals recognized its obligation to consider harmless error, holding as follows:

> Notwithstanding the above conclusion, we find that reversal is not warranted in this case.  To warrant reversal under the plain error standard, a defendant must show that the plain error affected his substantial rights; that is, "that the error affected the outcome of the lower court proceedings." *Carines*, 460 Mich at 763-764. Defendant cannot do so in this case.  First, it is apparent from the record that any prejudicial effect resulting from Williams' identification of defendant as the perpetrator was minimized by his defense counsel's rigorous cross-examination of Williams regarding his initial description of the assailants and the subsequent identification procedure that took place at the police station.  Thus, the jury was well aware of the problems associated with Williams' identification of defendant.  Moreover, while Williams' identification of defendant was the only direct evidence linking him to the armed robbery, we find the other, circumstantial evidence in this case was strong and sufficient to support defendant's convictions. Circumstantial evidence, along with the reasonable inferences drawn therefrom, can be sufficient to support a conviction. *People v Wilkens*, 267 Mich App 728, 738; 705 NW2d 728 (2005).
>
> In this case, the evidence established that defendant was in the Ford Escape after the armed robbery occurred.  Moreover, when defendant was later found hiding under a porch, he was in possession of Williams' stolen iPhone.  *See People v Hayden*, 132 Mich App 273, 283 n 4; 348 NW2d 672 (1984) ("It is well established that the jury may infer that the possessor of recently stolen property was the thief").  Finally, a black mask with eye holes cut out, which Williams testified was similar to the one used during the robbery, was found in the roadway near where the Ford Escape was stopped by police.  Defendant could not be excluded as a donor of DNA found on that mask.  It was reasonable for the jury to infer from all of this evidence that defendant was involved in the armed robbery.  Accordingly, defendant cannot demonstrate that the out-of-court identification of defendant by Williams affected the outcome of the trial, and reversal is not warranted.  *Carines*, 460 Mich at 763-764.

(MCOA Op., ECF No. 6-11, PageID.1142.)

- 26 -

Where, as here, the state court adjudicated the issue of harmless error, on the merits, " 'a federal court may not award habeas relief under § 2254 unless the harmlessness determination itself was unreasonable.' " *Davis v. Ayala*, 135 S. Ct. 2187, 2199 (2015) (quoting *Fry v. Pliler*, 551 U.S. 112, 119 (2007)). And a state-court decision is not unreasonable if " 'fairminded jurists could disagree' on [its] correctness." *Richter*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Petitioner therefore must show that the state court's decision to reject his claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." 562 U.S. at 103.

Applying this standard, I conclude that the Michigan Court of Appeals' finding of harmless error was reasonable. Although Williams' testimony was important to the case, *see Van Arsdall*, 475 U.S. at 684, his identification of Petitioner was qualified. He claimed only to identify Petitioner by his clothes, and defense counsel challenged that identification repeatedly, pointing out that Williams was unable even to describe the clothing before he was asked to make the identification. The jury therefore was aware of the weakness of the identification. Moreover, as the court of appeals observed, the circumstantial evidence in the case was extensive. Petitioner admitted riding in the vehicle while the phone was being transported away from the crime scene and while it was being electronically tracked by the victim and his girlfriend. A mask matching Williams' description was found on the road near where the vehicle was stopped by police. Petitioner ran from the vehicle when it was stopped. And Petitioner was found in possession of the phone, hiding from the police under a low porch. On

these facts, Petitioner cannot show that the state court's harmlessness determination "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Ayala*, 562 U.S. at 103.

Petitioner also claims that his trial attorney was ineffective in failing to object to or move to exclude the Williams' identification.  In *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel.  To establish a claim of ineffective assistance of counsel, the petitioner must prove:  (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome.  A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.  The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy.  *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack).  The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690.  Even if a court determines that counsel's performance was outside that range, the

defendant is not entitled to relief if counsel's error had no effect on the judgment.  *Id.*
at 691.

Expressly applying the federal constitutional standard, the court of appeals
concluded that Petitioner could not establish either prong of his *Strickland* claim:

> Defendant's claim of ineffective assistance of counsel also lacks
> merit.  To prevail on a claim of ineffective assistance of counsel, a
> defendant must establish both that (1) his defense counsel's performance
> was deficient; and (2) the deficient performance prejudiced his defense.
> *Strickland v Washington*, 466 US 668, 687; 104 S Ct 2052; 80 L Ed 2d 674
> (1984); *People v Pickens*, 446 Mich 298, 302-303; 521 NW2d 797 (1994).
> To show deficient performance, defendant must show that his counsel's
> representation fell "below an objective standard of reasonableness under
> prevailing professional norms."  *Pickens*, 446 Mich at 303.
> Correspondingly, to show prejudice, defendant must show that his
> counsel's deficient performance undermined the reliability of the verdict;
> that is, "a reasonable probability that, but for counsel's unprofessional
> errors, the result of the proceeding would have been different." *Id.* at 314.
> Counsel is presumed to have provided effective assistance, and defendant
> must overcome a strong presumption that counsel's assistance was sound
> trial strategy.  *Sabin (On Second Remand)*, 242 Mich App at 659.
>
> In this case, defendant cannot overcome the strong presumption
> that his counsel's failure to object to the identification testimony
> constituted sound trial strategy. As noted, defendant's counsel vigorously
> cross-examined Williams regarding his inability to describe the assailants
> following the robbery, as well as his subsequent identification of
> defendant at the police station, all of which tended to undermine
> Williams' credibility.  The goal of undermining Williams' testimony fits
> within the range of possible reasons why defense counsel chose not to
> object to the identification testimony at trial.  Thus, defense counsel's
> actions fell within a range of reasonable professional conduct, and
> defendant cannot establish that his performance was deficient. *Pickens*,
> 446 Mich at 303. Moreover, defendant cannot show that, but for counsel's
> failure to object, the outcome of trial would have been different.
> Accordingly, defendant's claim of ineffective assistance of counsel fails.

(MCOA Op., ECF No. 6-11, PageID.1142-1143.)

- 29 -

As the Supreme Court repeatedly has recognized, when a federal court reviews a state court's application of *Strickland* under § 2254(d), the deferential standard of *Strickland* is "doubly" deferential. *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)); *see also Burt v. Titlow*, 134 S. Ct. 10, 13 (2013); *Cullen v. Pinholster*, 131 S. Ct. 1388, 1403 (2011); *Premo v. Moore*, 562 U.S. 115, 122 (2011).  In those circumstances, the question before the habeas court is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*; *Jackson v. Houk*, 687 F.3d 723, 740-41 (6th Cir. 2012) (stating that the "Supreme Court has recently again underlined the difficulty of prevailing on a *Strickland* claim in the context of habeas and AEDPA . . . .") (citing *Harrington*, 562 U.S. at 102).

Petitioner does not, and cannot, overcome the double deference owed to the court of appeals' determination.  The court applied the correct constitutional standard and reasonably applied that standard to the facts of the case.  As the court of appeals recognized, trial counsel's performance is presumed to be effective and counsel's decisions are presumed to be strategic. *Strickland*, 466 U.S. at 689.  Given defense counsel's effective cross-examination of Williams, both on his description of clothing to police and his description of clothing at trial, counsel's decision not to object to the identification undoubtedly was a strategic attempt to undermine Williams' overall credibility.  Moreover, in light of the court's reasonable interpretation that the error in admitting the identification was harmless, Petitioner cannot demonstrate that he was prejudiced by his attorney's failure to object.

For all these reasons, Petitioner is not entitled to relief on his second habeas ground.

## Certificate of Appealability

Even though I have concluded that Petitioner's habeas petition should be denied, under 28 U.S.C. § 2253(c)(2), the Court must also determine whether a certificate of appealability should be granted.  A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability.  *Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001). Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted.  *Id.* at 467.

I have examined each of Petitioner's claims under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000).  Under *Slack*, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Id.*  "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims.  *Id.*

- 31 -

I find that reasonable jurists could not conclude that this Court's denial of Petitioner's claims would be debatable or wrong.  Therefore, I recommend that a certificate of appealability should be denied.

### Recommended Disposition

For the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied.  I further recommend that a certificate of appealability be denied.

Dated:  May 23, 2017                    /s/  Phillip J. Green
                                        PHILLIP J. GREEN
                                        United States Magistrate Judge

### NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within fourteen days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. MICH. LCIVR 72.3(b).  Failure to file timely and specific objections may constitute a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Keeling v. Warden, Lebanon Corr. Inst.*, 673 F.3d 452, 458 (6th Cir. 2012); *United States v. Branch*, 537 F.3d 582, 587 (6th Cir. 2008).  General objections do not suffice.  *See McClanahan v. Comm'r of Social Security*, 474 F.3d 830, 837 (6th Cir. 2006); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006).